# EXHIBIT 1

SINGLETON SCHREIBER LLP
PAUL STARITA (7624)
JULIA BRYANT (11594)
Wells Street Professional Center
2145 Wells Street, Unit 302
Wailuku, HI 96798
Telephone: (808) 707-7117

591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 771-3473
E-mail: pstarita@singletonschreiber.com
E-mail: jbryant@singletonschreiber.com

**Electronically Filed**
**SECOND CIRCUIT**
**2CCV-23-0000237**
**23-AUG-2023**
**06:07 PM**
**Dkt. 1 CMP**

## IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| LAWRENCE MICHAEL JANTOC, Individually and as Personal Representative of the Estate of Lawrenzo Mornaon Jantoc II,<br><br>Plaintiff,<br><br>v.<br><br>HAWAIIAN ELECTRIC INDUSTRIES, INC., a Hawaii corporation; HAWAIIAN ELECTRIC COMPANY, INC., a Hawaii corporation, HAWAI'I ELECTRIC LIGHT COMPANY, INC., a Hawaii Corporation; MAUI ELECTRIC COMPANY, LIMITED, a Hawaii corporation; and DOES 1–200, inclusive,<br><br>Defendants. | Civil Case No.<br>(Other Non-Vehicle Tort)<br><br>**COMPLAINT; DEMAND FOR JURY TRIAL**<br><br>**Jury Trial Requested: Damages Exceed $150,000** |

**COMPLAINT**

Plaintiff Lawrence Michael Jantoc, Individually and as the Biological son and as Personal Representative of the Estate of Lawrenzo Mornaon Jantoc II by and through his attorneys, Singleton Schreiber, LLP, and for a Complaint against Hawaiian Electric Industries, Inc.; Hawaiian Electric Company, Inc.; Hawai'i Electric Light Company, Inc.; Maui Electric Company, Limited, alleges and avers as follows:

## INTRODUCTION

1.      This Complaint arises from the Lahaina Fire, a wildfire caused by Defendants powerlines in the historic town of Lahaina in West Maui on August 8, 2023, as a result of Defendants' failure to properly design, construct, operate, manage, maintain, monitor and/or repair its electrical infrastructure.

2.      That day, residents of Maui County experienced horrors beyond their greatest imagination. In a matter of hours, the historic town of Lahaina, the former capitol of the Hawaiian Kingdom, was obliterated to ash and rubble by the fast-moving Fire that was accelerated by foreseeable and forecasted winds.

3.      The Fire ravaged through the streets, indiscriminately destroying anyone and anything in its path.

4.      Hundreds of people were engulfed by flames and thousands were forced to flee. Homes, businesses, churches, schools, and cultural sites were burned to the ground.





*Photograph from Brantin Stevens via AP*



*Photograph from: https://abcnews.go.com/US/maui-wildfire-survivor-recounts-harrowing-experience-hiding-beach/story?id=102258148*

## PARTIES

### A. PLAINTIFFS

5.      At all times relevant hereto, Plaintiff LAWRENCE MICHAEL JANTOC (hereinafter, "Jantoc"), is and was a resident of the City and County of Maui, State of Hawai'i.

6.      At all times relevant hereto, Plaintiff Jantoc was and is the biological son and is the duly-appointed representative of the Estate of Lawrenzo Mornaon Jantoc II.

**B. DEFENDANTS**

7.      Defendant Hawaiian Electric Industries, Inc., is a for-profit, investor-owned utility company and, at all times relevant to this pleading, was a Hawaii corporation authorized to do, and doing business, in Hawaii, with its headquarters in Honolulu, Hawaii. At all relevant times to this pleading, Hawaiian Electric Industries, Inc. provided a utility, including electrical services, to members of the public in Hawaii, including those in Maui County through its subsidiaries, including Hawai'i Electric Light Company, Inc., and Maui Electric Company, Limited. It is the largest supplier of electricity in the state of Hawaii. It does regular, sustained business throughout Hawaii, including in Maui County. Its principal place of business is in Honolulu at 1001 Bishop Street, Suite 2900, Honolulu, HI 96813.

8.      Defendant Hawaiian Electric Company, Inc., is a for-profit, investor-owned utility company and, at all times relevant to this pleading, was a Hawaii corporation authorized to do, and doing business, in Hawaii, with its headquarters in Honolulu, Hawaii. At all relevant times to this pleading, Hawaiian Electric Company, Inc. provided a utility, including electrical services, to members of the public in Hawaii, including those in Maui County. It is the largest supplier of electricity in the state of Hawaii. It does regular, sustained business throughout Hawaii, including in Maui County. Its principal place of business is in Honolulu at 820 Ward Avenue, Honolulu, HI 96814.

9.      Defendant Hawai'i Electric Light Company, Inc., is, and at all times relevant to this pleading, a Hawaii corporation authorized to do, and doing business, in Hawaii, with its headquarters in Hilo, Hawaii. At all times relevant to this pleading, Hawai'i Electric Light Company, Inc. acted to provide a utility, including electrical services, to members of the public in Hawaii, including those in Maui County. It does regular, sustained business throughout Hawaii, including in Maui County. Its principal place of business is in 54 Halekauila St Hilo, HI, 96720. Hawai'i Electric Light Company, Inc. is a subsidiary or other entity wholly controlled by Hawaiian Electric Industries, Inc., the largest supplier of electricity in the state of Hawaii.

10.      Defendant Maui Electric Company, Limited is, and at all times relevant to this pleading, a Hawaii corporation authorized to do, and doing business, in Hawaii, with its

4

headquarters in Maui, Hawaii. Its principal place of business is in Maui County at 210 Kamehameha Avenue, Kahului, Maui, HI. At all times relevant to this pleading, Maui Electric Company, Limited acted to provide a utility, including electrical services, to members of the public in Hawaii, including those in Maui County. Maui Electric Company, Limited is a subsidiary or other entity wholly controlled by Hawaiian Electric Industries, Inc., the largest supplier of electricity in the state of Hawaii.

11.     "Defendants" refers collectively to Hawaiian Electric Industries, Inc., Hawai'i Electric Light Company, Inc., and Maui Electric Company, Limited. Defendants supply electricity in Hawaii. They own, design, construct, operate, maintain, and repair powerlines and other equipment to transmit electricity to residents, businesses, schools, and industries in Hawaii, including in and around the ignition point for the Lahaina Fire.

12.     The true names and capacities of defendants DOES 1 through 200 are currently unknown to Plaintiffs who, therefore, sue these defendants under these fictitious names pursuant to Hawai'i Rules of Civil Procedure, Rule 17. These defendants are each directly and/or vicariously responsible, in some manner, for the harms alleged herein. Plaintiffs are investigating the facts leading up to the Lahaina fires. If/when Plaintiffs learn these defendants' true names and capacities, Plaintiffs will seek leave to amend this pleading accordingly.

13.     Defendants are jointly and severally liable for each other's conduct pursuant to Hawai'i Revised Statutes section 663-10.9. Hawai'i Electric Light Company, Inc., and Maui Electric Company, Limited are wholly owned, and entirely controlled, by Hawaiian Electric Industries, Inc. Defendants' officers and management are intertwined. Therefore, Defendants are the agents, servants, employees, partners, aiders and abettors, co-conspirators, and joint venturers of each other.

14.     The Defendants identified in paragraphs 7-13, above, are hereinafter collectively referred to as "Defendants".

15.     All conditions precedent to the maintenance of this action have been satisfied, waived, or occurred.

## STATEMENT OF JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this civil action under Hawai'i Revised Statutes section 603-21.5.

17.     This Court has personal jurisdiction over each Defendant either because Defendants are corporations created by or under the laws of this state, are domiciled in Hawai'i, are organized under the laws of Hawai'i, and/or maintain their principal place of business in Hawai'i, transact business in Hawai'i, perform work in Hawai'i, provide services in Hawai'i, caused tortious injury in Hawai'i, derive substantial revenue from services used or consumed in Hawai'i, and/or have interests in, use, or possess real property in Hawai'i. Plaintiffs allege that Defendants' acts and omissions within this state caused Plaintiffs to suffer injury within this state.

18.     Venue in this Court is proper under Hawai'i Revised Statutes section 603-36(5) because Plaintiffs claims for relief arose in the County of Maui.

19.     At all times relevant to this action, Plaintiffs and Defendants have been citizens of Hawai'i.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

20.     On August 8, 2023, Lawrenzo "Buddy" Mornaon Jantoc II (hereinafter "Buddy") tragically passed away after suffering second- and third-degree burns involving approximately 90% of his total body, including his face, head, neck, chest, abdomen, back, upper extremities, and lower extremities, as well as smoke inhalation.

21.     At just 79 years old, Buddy left behind his children, grandchildren, and a legacy in the music cultural community, and among others.



*Photograph from Kawehi Paio/Facebook*

22.     Buddy was a happy-go-lucky guy who was always smiling. In his younger years, he traveled the world playing music with bands such as Santana. Even in his old age, his love for music and 'ohana kept him going. He was a well-loved musician in Lahaina.



*Photograph from Agnes Gary/ Facebook*

7

23.     On the date of his untimely death on August 8, 2023, Buddy was at his home in a housing complex for seniors located at Eono – Hale Mahaolu Senior Complex, 200 Hina Avenue Kahului, Maui, Hawai'i 96732.

24.     On August 8, 2023, while resting at his home, suddenly and without warning, fires erupted around his home. As the fires in Lahaina traveled aggressively through the town, Buddy had no way of knowing what was about to occur in a matters of minutes.

25.     In the days leading up to August 8, 2023, the National Weather Service issued High Wind and Fire Warnings, repeatedly warning that these conditions would create the perfect environment for wildfires.

26.     On Friday, August 4, 2023, the National Weather Service in Honolulu (the "Service") advised that Hawai'i could experience "indirect impacts" from Hurricane Dora from Monday, August 7, 2023 through Wednesday, August 9, 2023, including "Strong and gusty trade winds" and "Dry weather & high fire danger."



27.     In its Tweet on Sunday, August 6, 2023, the Service warned that significant differences in atmospheric pressure between Hurricane Dora and the air north of Hawai'i formed a pressure gradient over the islands which, when combined with dry conditions, posed a serious threat of fires as well as damaging winds.

28.     Also on August 6, 2023, the Service posted an update on Hurricane Dora on X, which included the following warning: "While Hurricane Dora passes well south with no direct impacts here, the strong pressure gradient between it & the high pressure to the north creates a threat of damaging winds & fire weather (due to ongoing dry conditions) from early Mon to Wed."[1]

29.     On Monday, August 7, 2023, at 4:42 a.m., the Service issued red flag warnings due to months of drought, low humidity and high winds. The Service predicted high gusts of wind up to 60 miles per hour.

30.     Maui fire officials also warned in an alert issued August 8, 2023, that "erratic wind, challenging terrain, steep slopes and dropping humidity, the direction and the location of the fire conditions make it difficult to predict path and speed of a wildfire."



31.     Accordingly, prior to and on August 8, 2023, Defendants—which provide service to 95 percent of the state's residents—knew about the extreme threat of fires in Maui. However,

---

[1] NWSHONOLULU, (Aug. 6, 2013), https://twitter.com/NWSHonolulu/status/1688339741685792768.

despite these warnings, Defendants did not conduct a public power shut-off or de-energize their powerlines, despite having knowledge that these are proven methods to prevent wildfires.

32.     On August 8, 2023, the strong dry winds from Hurricane Dora came as expected after months of drought. The winds predictably led to trees crashing into Defendants' powerlines, which toppled, igniting surrounding vegetation in communities across Maui, including Lahaina. Over 30 utility poles, some of which were energized, fell onto trees and roads, complicating evacuations.

33.     Predictably, the resulting wildfire turned deadly as it destroyed the historic town of Lahaina—the former capital of the Hawaiian kingdom—and spread throughout other areas of Maui, burning over 11,000 acres and catastrophically impacting local communities. Over 2,700 structures have been damaged or destroyed.

34.     Buddy's death and Plaintiff's harm was a direct result of Defendants' refusal to de-energize their powerlines, maintain vegetation, and their infrastructure. Specifically, Defendants' failure to conduct a public power shut-off or de-energize their lines is and was indefensible due to: (a) the nature and condition of Defendants' utility infrastructure, which was intended, designed, and constructed to pass electricity through exposed powerlines in vegetated areas; (b) Defendants' aging infrastructure and deferred maintenance; (c) Defendants' failure to maintain the proper tension in their lines to prevent sagging, which is proven to lead to fires, despite years of complaints and warning from Maui residents; (d) Defendants' failure to implement proper vegetation management programs to protect their lines against trees crashing into them during high winds; and (e) Defendants' prior knowledge that deenergizing its powerlines is the most effective safety measure to prevent wildfires.

### A.    Defendants have a duty to safely maintain and operate their electric utility infrastructures.

35.     Defendants supply electricity throughout Hawai'i and in the County of Maui. They own, operate, maintain, and repair electric utility infrastructures that transmit electricity to residents, businesses, schools, and industries in Hawai'i, including in and around Lahaina.

36.     Operating high-voltage electric equipment as part of an electric utility infrastructure carries inherent dangers. The inherent and heightened danger associated with the transmission and distribution of electricity through overhead powerlines in vegetated areas requires Defendants to exercise an increased level of care to protect the public and the communities in which their electric utility infrastructures operate. Moreover, Defendants have a level of expertise about the operation of an electric utility infrastructure far beyond that of a layperson and, as such, owe a heightened duty commensurate with this expertise.

37.     Defendants have a duty to adequately operate, monitor, maintain, and repair their electric utility infrastructures to ensure that they do not cause fires. This duty includes deenergizing their powerlines during periods of critical fire risk to prevent fires and to allow first responders to safely access ignited areas to put out fires. Defendants' duty also includes maintaining the land and vegetation around their infrastructure and equipment to ensure that vegetation, objects, and structures will not come into contact with their electric utility infrastructure.

**B.      Defendants designed, constructed, used and maintained their utility infrastructure in a manner that would allow a fire to ignite.**

38.     Defendants designed their powerlines to transport electricity to its substations and from the substations to the public directly into their homes. The powerlines' circuitry and conductors were electrically a single and unified circuit that transmitted electricity.

39.     Defendants designed, constructed, used, and maintained their utility infrastructure's system protection devices (which are used to respond to an overcurrent event) in a manner that would keep their powerlines energized for too long after a transmission line failure, allowing a fire to ignite. Defendants could have designed the system protection devices to shut off faster but failed to do so because tripping the circuit costs time and money. Defendants' decision was a cost-saving one that allowed older, slower equipment to remain in place.

40.     Defendants designed their powerlines to be uninsulated, bare, and/or uncovered conduit carrying high voltage electricity that posed an increased risk of igniting should they come into contact with vegetation or other electrical equipment. Defendants could have designed their

powerlines to be insulated and covered, and therefore less likely to ignite vegetation, but failed to do so.

41.     Defendants constructed their powerlines such that they traveled above ground using wooden poles, and left dry, overgrown vegetation below them. Defendants could have constructed their powerlines to travel underground, a request residents and energy experts have made many times, but Defendants ignored. Defendants also could have removed nearby vegetation entirely, but failed to do so.

42.     Defendants designed and constructed their powerlines so that they would reenergize too soon after being de-energized. Defendants could have designed and constructed their powerlines with reclosers that operated more safely but failed to do so.

43.     Defendants had a responsibility to maintain and continuously upkeep their utility infrastructure, including their powerlines, and to implement vegetation management programs and protocols to ensure the safe delivery of electricity to the public. They failed to do so and allowed their infrastructure to age and deteriorate. Some residents have been battling with Defendants for at least 10 years over the condition of the infrastructure. Long before the fire, several residents emailed Defendants and provided videos of low hanging lines in trees.[2]

**C.     Defendants knew about the extreme fire risks and what to do to prevent wildfires during extreme weather conditions.**

44.     In 2014, the Hawaiʻi Wildfire Management Organization issued a 2014 wildfire mitigation plan, which warned that warned Lahaina was among Maui's most fire-prone areas based on its proximity to grasslands, steep terrain, and frequent winds and outlined a plan for working with utilities to help reduce the risk of fires.

45.     When a fire broke out in 2020, in Oʻahu, the Honolulu Fire Department attributed the fire to powerlines from a different utility company failed in Hurricane Lane's high winds evidencing fires started by utility poles is a real threat.

---

[2] *Power lines likely caused Maui's first reported fire, video and data show*, THE WASHINGTON POST (Aug. 16, 2023), https://www.washingtonpost.com/climate-environment/2023/08/15/maui-fires-power-line-cause/.

46.     The 2020 Maui County Hazard Mitigation Plan Update depicts Lahaina and all Lahaina buildings as occupying a "High" Wildfire Risk Area.

47.     Thus, Defendants knew that utility infrastructure could cause fires and that Lahaina was in a high wildfire risk area. Defendants also knew that deenergizing powerlines is an effective way to prevent wildfires during periods of elevated fire danger, including during high wind events. Electric utilities have long used intentional temporary outages to prevent fires. In California, Oregon, Nevada and other states, downed powerlines, sparks from transmission hubs, and other electrical-grid failures have started or spread some of the deadliest and most destructive blazes in U.S. history. That has prompted these states proactively to shut down power to communities when red-flag conditions arise. Defendants recognized that a power shut-off plan could be effective, especially after it reviewed what happened with California's 2018 Camp Fire, which killed 85 people. Last year, Defendants pointed to California's Public Power Shutoff Plan as a successful way to prevent wildfires when additional robust techniques are not yet in place.

48.     Yet, when fire potential in and near Maui County was well above normal levels on August 6, and August 7, 2023, due in part to extreme drought conditions, dry brush, and high winds caused by Hurricane Dora passing on the South, Defendants kept their powerlines active.

49.     Starting on Friday, August 4, 2023, the National Weather Service (the "Service") began issuing warnings about dangerous weather conditions and high winds for fires in Hawai'i. The Service advised winds of 25 to 45 miles per hour with localized gusts of more than 60 mph were expected for Maui, Molokai, Lanai, Oahu, Hawai'i Island and portions of Kauai. The Service and media warned that damaging winds could blow down trees and powerlines. The Service issued a fire watch for the leeward portions across the state starting this morning though late Tuesday night due to the high winds and humidity being 40 to 45 percent during the afternoons and evening. The Service advised any fires that develop will likely spread rapidly.

50.     On Monday, August 7, 2023, at 4:42 a.m., the Service issued a "Red Flag Warning" that continued until August 10, 2023 at 6:00 a.m. and predicted extreme winds and fire dangers. The Service issues a "Red Flag warning" when "warm temperatures, very low humidities, and

stronger winds are expected to combine to produce an increased risk of fire danger."[3]

51.     On August 8, 2023, the Governor of Hawai'i issued a proclamation relating to wildfires. The Governor stated that very dry conditions and strong and potentially damaging easterly winds caused by the passage of Hurricane Dora to the south of the State are contributing to the wildfire danger. The Governor directed the Director of Hawai'i Emergency Management and the Administrator of Emergency Management to take appropriate actions to direct or control, as may be necessary for emergency management, including issuing alerts, warning, notifications and activations, issue warnings and signals for alerts and any type or warning device, system, or method to be used in connection therewith, shut off water mains, gas mains, electric power connections, or suspension of other services, and issue mandatory evacuations.

52.     Maui Fire officials warned in an alert issued August 8, 2023, that "erratic wind, challenging terrain, steep slopes and dropping humidity, the direction and the location of the fire conditions make it difficult to predict path and speed of a wildfire."

53.     Defendants' own monitoring system provided advance notice of issues with its powerlines to Defendants allowing ample time to shut down power. On the night of August 7, 2023, and into the early morning hours, Defendants' data showed powerlines began losing voltage, which can happen when vegetation interferes with wires, lines touch power poles or electrical equipment malfunctions. Defendants had almost 1,000 sensors in Hawai'i and about 70 on Maui. A major fault was felt by all sensors on the island but was strongest near Lahaina.[4]

D.     **Defendants' actions predictably and inevitably led to a fire igniting on August 8, 2023.**

54.     Before August 8, 2023, Defendants knew that there was an extreme fire risk in and near Maui County. They also knew that wildfires are on average ten times larger than other types of fires. Despite this, Defendants left their powerlines energized when the winds hit exactly as

---

[3] *Red Flag Warning*, NATIONAL WEATHER SERVICE, (Aug. 11, 2023), https://www.weather.gov/mqt/redflagtips.
[4] Peter Eavis, Ivan Penn and Thomas Fuller, *Experts Scrutinize Hawaiian Electric as They Search for the Maui Wildfire Cause*, THE NEW YORK TIMES, (Aug. 15, 2023), https://www.nytimes.com/2023/08/14/us/hawaiian-electric-maui-wildfire.html#:~:text=Devastation%20in%20Lahaina-,Experts%20Scrutinize%20Hawaiian%20Electric%20as%20They%20Search%20for%20the%20Maui,lines%20fell%20in%20the%20windstorm..

predicted. Defendants failed to de-energize their powerlines despite the National Weather Service's warnings, and despite all the other information Defendants knew about the elevated risk of fire on that day.

55.     Defendants' failure to de-energize their lines on August 8, 2023, was even more egregious in light of their prior acknowledgement and the condition of their utility infrastructure. Defendants knew that (a) their utility infrastructure was intended, designed, and constructed to pass electricity through wooden poles and exposed powerlines in vegetated areas; (b) their aging utility infrastructure was intended, designed, and constructed with poorly designed system protection devices that reboot too quickly; (c) they had a history of improperly maintaining the line tension in their powerlines; (d) they failed to properly, safely, and prudently maintain the vegetation and land surrounding their electrical infrastructure and equipment; and (e) they knew the surrounding vegetation was dry due to the severe drought.

56.     When the high winds, with gusts reaching up to 60 miles per hour, came as predicted, the natural and ordinary consequences of Defendants' choices led to their powerlines falling and starting a brush fire on August 8, 2023, at 6:37 a.m. in the area of Lahainaluna Road. Given the predicted conditions (including wind speed and direction, topography, and the manner in which wildfires spread), the inevitable consequence of the ignited fires was the creation of a wildfire that spread to Plaintiffs' homes, properties and throughout Maui County completely destroying Lahaina.



*Photograph from: https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/*



57.     The Lahaina Fire occurred because Defendants: (a) failed to de-energize their powerlines on August 8, 2023; (b) intended, designed and constructed their utility infrastructure to pass electricity through exposed powerlines in dry, vegetated areas; (c) failed to prudently inspect, maintain, and operate the electrical equipment in their utility infrastructure; and (d) failed

to maintain the appropriate clearance area between its electrical equipment and surrounding vegetation.

58.     The conditions and circumstances surrounding the ignition of the Lahaina Fire—including the nature and condition of Defendants' electrical infrastructure, low humidity, strong winds, and tinder-like dry vegetation—were forecasted and foreseeable by any reasonably prudent person. Such conditions and circumstances were therefore foreseeable to Defendants, who have special knowledge and expertise as electrical services providers.

**E.     Defendants' actions predictably led to Plaintiffs' harm.**

59.     Defendants knew that any fire that started on August 8, 2023, in Maui County would be almost impossible to contain due to the high winds, dry conditions, high fuel loads, topography, high energy release conditions, limited escape routes, and limited access for firefighters and emergency personnel.

60.     The inevitable consequence of Defendants' intentional decisions, the Lahaina Fire caused Buddy's excruciating, painful injuries, and death.

<u>COUNT I</u>

<u>NEGLIGENCE - SURVIVAL</u>

<u>(Against All Defendants)</u>

61.     The allegations made in the foregoing paragraphs are hereby incorporated by reference as though fully set forth herein.

62.     Plaintiff Jantoc, as Personal Representative of the Estate of Lawrenzo Mornaon Jantoc II, brings this action on behalf of the Estate of Lawrenzo Mornaon Jantoc II by virtue of the HRS §§ 560:2-703(c) and 663-7.

63.     At all times relevant hereto, Lawrenzo Mornaon Jantoc II exercised all appropriate due care and in no way contributed to the occurrence of the Lahaina Fires and/or their injuries and damages.

64.     Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and

requires the exercise of increased care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through a utility infrastructure safe under all circumstances and exigencies.

65.     Defendants have special knowledge and expertise far beyond that of a layperson about the safe design, construction, operation, maintenance, and repair of their utility infrastructure. The provision of electrical services involves a peculiar and inherent danger and risk of wildfires.

66.     Before and on August 8, 2023, Defendants had a non-delegable duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in designing, constructing, operating, maintaining, monitoring, and repairing their utility infrastructure. This duty also required Defendants to maintain appropriate vegetation management programs for the control of vegetation surrounding Defendants' exposed powerlines. This duty also required Defendants to consider the changing conditions of Defendants' electric utility infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required Defendants to take special precautions to protect nearby properties from wildfires caused by Defendants' electric utility infrastructures.

67.     Additional regulations applicable to Defendants included, without limitation, the requirement that Defendants deenergize their powerlines during high wind and fire warnings, trim or remove vegetation to maintain clearances from electric supply conductors. Moreover, Defendants needed to have a vegetation management program and keep appropriate records to ensure that timely trimming is accomplished to keep the designated minimum clearances.

68.     Defendants each breached their duties by, among other things:

    a.     Failing to operate, maintain, and repair their electric utility infrastructure so that the systems would withstand the foreseeable risk of fires;

    b.     Failing to prevent powerlines from improperly sagging or making contact with metal or other powerlines;

    c.     Failing to properly inspect and maintain vegetation in proximity to their

energized powerlines to mitigate the foreseeable risk of fire;

d.      Failing to conduct reasonably prompt, proper, and frequent inspections of their electric utility infrastructure;

e.      Failing to promptly de-energize their electric utility infrastructure during fire-prone conditions;

f.      Failing to promptly de-energize their electric utility infrastructure after vegetation fell on their powerlines;

g.      Failing to promptly inspect their powerlines after vegetation fell on them;

h.      Failing to properly train and supervise employees and agents responsible for maintenance and inspection of their electric utility infrastructure; and/or

i.      Failing to implement and follow regulations and reasonably prudent practices to avoid fire ignition;

j.      Failing to respond to resident complaints regarding its infrastructure; and/or

k.      Failing to adequately respond to notices from its own system monitoring system of issues with its powerlines.

69.     Defendants knew of the extreme fire danger that the conditions immediately before August 8, 2023, created, and they breached their duties of reasonable care to Plaintiffs by failing to act reasonably despite that knowledge. The Lahaina Fire was a direct, legal, and proximate result of Defendants' breach of their duties of reasonable care to Plaintiffs.

70.     Through their conduct described herein, Defendants violated rules and regulations applicable to them. Among other things, Defendants failed to deploy employees to survey their powerlines and ensure that none had been damaged or downed; failed to cut power to their lines once the fire started; and knowingly permitted the creation of circumstances where high winds were more likely to bring vegetation into contact with powerlines, where downed powerlines were more likely to have been damaged by falling vegetation or to have made contact with flammable vegetation, and where the reenergization of those lines without prior and proper inspection would create an extreme risk of a resulting wildfire.

71.     The statutes and regulations that Defendants violated are intended to prevent the exact type of harm that Plaintiffs suffered because of Defendants' failure to comply with the statutes and regulations. Defendants' failure to comply with the statutes and regulations directly, legally, and proximately resulted in the Lahaina Fire, and was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

72.     Defendants acted with a conscious indifference to the probable and foreseeable consequences of their acts and omissions. In particular, following the devasting 2018 Camp Fire in California, Defendants publicly acknowledged that deenergizing powerlines in windy conditions was necessary to prevent devasting wildfires. Despite this knowledge, and despite their knowledge that Maui would be beset by windy conditions on or immediately before August 8, 2023, Defendants chose not to de-energize their powerlines. Defendant's conscious indifference to the risk of wildfire on August 8, manifesting as, among other things, a decision not to de-energize their lines, amounts to arson under Hawai'i Revised Statute section 708-8254. Defendant's conscious indifference to the risk of wildfire on August 8, manifesting as, among other things, a decision not to de-energize their lines, was a substantial factor in causing the Lahaina Fire and Plaintiffs' resulting damages therefrom.

73.     As a direct and legal result of Defendants' actions and/or omissions that caused the Lahaina Fire, Plaintiff was exposed to fire, significant levels of smoke, and toxic air pollutants.

74.     Plaintiff seeks survival damages to be determined, according to proof at trial, including, but not limited to pain and suffering, loss of income, loss of personal property, and emotional distress damages associated with Buddy's personal injuries and death.

**Count II**

**GROSS NEGLIGENCE**

**(Against All Defendants)**

75.     All preceding paragraphs are incorporated into this claim for relief as if set forth herein.

76.     Defendants knew of the extreme fire danger that the high winds posed to their

overhead electrical infrastructure, particularly during Red Flag conditions. These risks included winds that couple topple over power poles and powerlines, causing them to fall to the ground, ignite vegetation, and cause a wildfire that would spread rapidly.

77.     Despite having knowledge of the extreme risks of wildfires, Defendants chose not to de-energize their powerlines during the High Wind Watch and Red Flag Warning conditions for Maui prior to the Lahaina Fire.

78.     Furthermore, Defendants chose to not de-energize their powerlines even after they had knowledge that some poles and lines had fallen and were in vegetation or the ground.

79.     Defendants further failed to de-energize their lines, during and after the Lahaina Fire.

80.     Accordingly, Defendants acted with indifference to the probable consequences of their acts and omissions.

81.     Despite having knowledge of the risks of high winds and wildfires generally, a High Wind Watch, a Red Flag Warning, notices from its own monitoring system that its powerlines were experiencing issues in the days leading up to the Lahaina Fire, and specific warnings that high winds could blow down power poles and that fires would spread rapidly if ignited, Defendants did nothing.

82.     In addition, the Lahaina Fire was a result of Defendants' continued practice of prioritizing profits over safety, wherein they failed to properly construct, maintain, manage, and/or inspect their electrical equipment knowing that the likely outcome was a fire that would cause harm to members of the public and destruction of structures and property.

83.     Defendants, including one or more of Defendants' officers, directors, and/or managers have a history of acting recklessly and with conscious disregard to human life and safety, and this history of recklessness and conscious disregard was a substantial factor in bringing about the Lahaina Fire. This is despicable and oppressive conduct.

84.     Defendants' gross negligence proximately caused the Buddy's death and Plaintiff's injuries.

85.     Plaintiff seeks survival damages to be determined, according to proof at trial, including, but not limited to pain and suffering, loss of income, loss of personal property, and emotional distress damages associated with Buddy's personal injuries and death.

86.     Consequently, Plaintiff additionally seeks punitive and exemplary damages in an amount sufficient to punish Defendants' and deter such conduct in the future.

**COUNT III**

**WRONGFUL DEATH**

**(Against All Defendants)**

87.     The allegations made in the foregoing paragraphs are hereby incorporated by reference as though fully set forth herein.

88.     Plaintiff Jantoc, Individually and as Personal Representative of the Estate of Lawrenzo Mornaon Jantoc II, brings this action for the wrongful death of Lawrenzo Mornaon Jantoc II by virtue of HRS § 633-3.

89.     Lawrenzo Mornaon Jantoc II passed away on August 8, 2023, and no action for his injuries was concluded during his lifetime.

90.     As a direct and legal result of Defendants' negligent and grossly negligent conduct, and engagement in ultra-hazardous and/or abnormally dangerous activities, Plaintiff Jantoc has suffered loss of love and affection, including loss of society, companionship, comfort, consortium, and protection; loss of care, attention, advice, and counsel; loss of filial care or attention, for all of which damages are claimed.

91.     As a direct and legal result of Defendants' negligent and grossly negligent conduct and engagement in ultra-hazardous and/or abnormally dangerous activities, Plaintiff Jantoc, as Personal Representative of the Estate of Lawrenzo Mornaon Jantoc II, has suffered pecuniary loss and expenses, including hospital, funeral, and burial expenses, for all of which damages are claimed.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendants, jointly and severally, if and where appropriate, as follows:

1. An award of general damages in an amount to be determined at trial;

2. An award of special damages in an amount to be determined at trial;

3. An award of punitive damages in an amount to be determined at trial;

4. Reasonable attorney's fees as may be appropriate;

5. Prejudgment interest and allowable costs of the action, and;

6. For such other and further relief as this Court deems just and proper.


Dated: August 23, 2023                         Respectfully submitted,


/s/ *Paul Starita*
Paul Starita
SINGLETON SCHREIBER LLP
Wells Street Professional Center
2145 Wells Street, Unit 302
Wailuku, HI 96798
Telephone: (808) 707-7117

591 Camino de la Reina, Suite 1025
San Diego, CA 92108
(619) 771-3473